IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | : | | |
| v. | : | **Criminal No.** | **1:20-CR-100** |
| FELICIA DONALD | : | | |
| Defendant | : | | |

## DEFENSE OPPOSITION TO
## MOTION TO REVOKE BOND

Felicia Donald, through counsel, responds to the prosecution's filing from

yesterday afternoon, after business hours.  This is not a case, as will be more fully

presented at tomorrow's hearing, where the conduct alleged constitutes sufficient grounds

to incarcerate Felicia Donald at this time.  There are terms and conditions available that

can be imposed to accomplish this Court's goals and her release so that she is able to

assist her new counsel in their becoming familiar with the case, being prepared to

represent her, and ensure a just and fair resolution of this matter.  In addition to Felicia's

medical conditions, including a type of blood cancer, hypertension, and apnea, and being

over 65 years of age, there are also current restrictions at the Alexandria Jail, wherein

inmates have limited access to their attorneys and materials necessary for preparing a

defense.  It cannot be said that there are just no conditions whatsoever that can be

fashioned for her release.

The movant has significant community ties and does not pose a risk of flight which

is crucial to this issue.  As the attached letters of support indicate, she is at the core, a big

hearted person who lacks the common understanding of the real world which many of us take for granted. As Dr. Branconi, MD (see attached letters) recognized, she may be suffering from psychiatric difficulties. More serious testing and evaluation regarding cognitive deficits appear appropriate. The alleged violations of communicating with two individuals who have been closely involved in her life for more than twenty (20) years, are not a basis to keep her locked up for the time it will take to conclude her case. Those two, from an apparent reading of the conditions of release, are not within its prohibitions. Giving a sonogram is also not a basis to confine her. These are not violations and even if they could be shown to be so, that is not a sufficient basis for incarceration at this time. Felicia is not one to threaten or intimidate witnesses. It is not part of her character. Indeed, Felicia's conduct is minimal compared to some other cases where cooperating informants have violated their terms of release by conducting themselves unlawfully and remained at liberty.

The Bail Reform Act empowers this Court to use its broad authority and judicial powers to fashion terms and conditions of release in cases such as this from a wide array of options. *See* 18 U.S.C. §3142. The Act contemplates release in every case where the Court can "reasonably assure" that the defendant will appear at subsequent proceedings and will not pose a danger to the community. *See* 18 U.S.C. §3142(b). Felicia Donald has had no experience with our criminal law system and poses no risk of flight nor risk of harm to anyone. There are terms and conditions of release which reasonably assure her attendance at court and the safety of the community. The lack of a criminal record, her

2

community ties, and her own initiation of this investigation by alerting Pharmacies of the fraudulent use of her prescription pads by employees (whom she fired for that conduct) establish that she is neither a risk of flight nor a danger to anyone.

The Supreme Court has said that "[f]reedom from imprisonment – from government custody, detention, or other forms of physical restraint – lies at the heart of the liberty th[e] [Fifth Amendment] protects." *Zadvjdas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 2498 (2001). *See also Foucha v. Louisiana*, 504 U.S. 71, 112 (1992) (describing freedom from physical restraint as being at the core of constitutional rights under Fifth Amendment.) This is of particular importance in a case such as this where new counsel are in need of the defendant's continued assistance in coming to understand the case, the evidence, and facts about the client, so that a valid defense can be presented. That is more difficult now in the time of COVID-19.

In *United States v. Steinhorn*, 927 F.2d 195 (4th Cir. 1991), a defendant was convicted of money laundering and interstate transportation of stolen goods. He was released on bond pending appeal despite the conviction and sentence and the strict requirements of 18 U.S.C. § 3143(b)(2). The Fourth Circuit found that the District Court was correct in granting him conditions of release pending appeal. That was a case which required more stringent conditions than this case. Release ought to be granted in this case so that Felicia can assist in her defense. The Supreme Court considered bond in an espionage case from this Court, after conviction, in the *United States v. Truong* 439 U.S.

3

1326 (1978). In that case there was only proof of a possibility of, but not any evidence of, an inclination to flee. Bail, post conviction for espionage, was granted.

In fact, in cases in which defendants have engaged in far more egregious behavior than this and have seemed far less likely to appear at court, they were still allowed conditions of release because the Act has such a broad grant of authority for courts to fashion appropriate conditions. In *United States v. Chimurenga*, 760 F.2d 400 (2d Cir. 1985), for example, the government introduced a vast amount of damaging evidence to justify detention. The defendant, Chimurenga, was the leader of a group responsible for an armed robbery which resulted in the death of an armored truck guard and two police officers. The government's proof included taped conversations in which the defendant instructed his co-defendants on how to kill armored truck guards; furthermore, there were also taped conversations in which the defendant advised other defendants to cut their emotional ties and flee rather than face the prospect of a lengthy imprisonment. Additional evidence linked the defendant to a series of planned, violent crimes including the planned prison escape of co-conspirators. Other evidence indicated that he had access to false identifications and bank accounts under false names. Yet, despite all of this evidence, Chimurenga was released by the district court which was able to fashion workable conditions of release. The court applied the vast array of Bail Reform Act powers given to it to fashion terms and conditions of release which, in practical terms, fit that case. The court of appeals upheld the district court's determination. *Id.* at 405. The conditions were imposed and worked. That case certainly presented a much more severe

4

situation than is presented here. Chimurenga was a potentially violent criminal who had even made plans to flee and to help others break out of prison. That is a far cry from this case. Felicia Donald can be released, can be monitored, and can meet conditions tailored to her circumstances, including her various health issues.

The reasonable assurance standard was originally enunciated in *United States v. Orta*, 760 F.2d 887 (8th Cir. 1985) (*en banc*). The defendant in *Orta* was released despite the fact that she had struck a woman in the head with a revolver and had several weapons and various quantities of marijuana and cocaine in her apartment. Further, Orta was known to carry a loaded gun in her purse. Finally, she and her husband had also threatened witnesses in their case. Despite all of these disturbing facts and a charge of conspiracy to possess with intent to distribute cocaine, Orta was not detained because the court applied its authority and fashioned conditions of release to fit that case. *See also United States v. Jackson*, 845 F.2d 1262 (5th Cir. 1988) (defendant, a member of a notorious motorcycle gang with a well-known history of lawlessness and violence and a nationwide network of associates, and who had been arrested several times in the past, was not detained; conditions were set that worked); *United States v. Dominguez*, 783 F.2d 702 (7th Cir. 1986) (defendant released despite being involved in a widespread narcotics distribution organization and having money and ability to flee because workable conditions of release could be set and were obeyed).

The *en banc* court of appeals held that the government could not detain unless it showed by clear and convincing evidence that there was absolutely *no* condition or set of

conditions at all which the court could fashion to reasonably assure the defendant's appearance and the safety of the community. The court held what is well recognized, i.e., that "reasonably assure" does *not* mean guarantee. The Bail Reform Act of 1984 <u>favors release</u>. Congress intended that detention should apply only to a "small number" of dangerous defendants. *Id.* at 890-91. This is not one of those rare cases. Felicia is not dangerous. She is not someone who poses a risk of harm to anyone. She is an ingenue to this all but not a risk to hurt anyone. The intent of Congress and the Act is for some reasonable conditions of release in cases such as this.

The facts in the instant case establish that Felicia is not a flight risk or danger in this case. She is far different than the released defendants in *Chimurenga*, *Orta*, *Jackson*, or *Dominguez*.

*United States v. Salerno*, 481 U.S. 751 (1987) is the seminal decision from the Supreme Court on the Bail Reform Act. The Court made it clear in that decision that a defendant has the right to counsel, to call witnesses on her behalf, to proffer evidence (which only defendants may do as per 18 U.S.C. §3142(f)), and to cross examine the prosecution's witnesses in a bail hearing. *Id.* at 752. For this reason, the Act gives courts wide latitude in setting conditions of release and requires that a judicial officer ought not detain unless it is found that there are absolutely no conditions or combination of conditions that can be said to reasonably assure the appearance of the accused and safety of the community. Under the provisions of the Act, as applied to this case, there

are conditions of release which this Court, in its wisdom, broad discretion, and authority,

can set to allow her release in compliance with the Act.

FELICIA DONALD
By Counsel

_____/S/_____
Bret D. Lee, Esq. (VSB #82337)
15021 Judicial Drive Suite 100
Fairfax, VA 22030
703 936 0580
bret@bretlee.com
Counsel for Defendant


_____/S/_____
Marvin D. Miller, Esq. (VSB #1101)
1203 Duke Street
Alexandria, Virginia 22314
703 548 5000
ofc@mdmillerlaw.com
Counsel for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of August 2020, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, sending a notification of such filing to Assistant US Attorney Raj Parekh.

_____/S/_____
MARVIN D. MILLER

From: **Jeanie Branconi** branconimd@gmail.com
Subject: Fwd: letter to judge
Date: May 17, 2020 at 12:49 PM
To: david@dischleylaw.com

--------- Forwarded message ---------
From: **Jeanie Branconi** <branconimd@gmail.com>
Date: Sun, May 17, 2020 at 12:42 PM
Subject: Re: letter to judge
To: Felicia Donald

Judge Leonie M. Brinkema
c/o Dischley Law, PLLC
9255 Center Street, Suite 300B
Manassas, VA 20110

Re: Dr Felicia Donald MD

My name is Dr Jeanie Branconi MD. I met Felicia Donald MD about 35 yrs ago, when
I was a RN CCRN in Tucson, AZ and she was an Intern in OB/GYN.  I was considering
going to Medical School.  She encouraged me to pursue that dream.

While I was a Medical Student she invited me to rotate with her and stay with her
family to learn OB/GYN.  I did so both as a Medical Student and later as a Resident
Physician.  I saw she was the glue that held her family together.  I stayed with
Felicia at her Mom and Dad's house during one trip. Felicia's Psychotic brother Scott
was living there at that time.  Felicia's  Mom was diagnosed with terminal Cancer.  It
was Felicia who made sure her Mom got the care she needed.  I was aware of the
conversations where Felicia's Mom left Felicia's brother Carr Matthew, money to pay
for Scot and asked Carr Matthew to be sure he used that money for Scot's needs..
Carr Matthew spent the money on himself.  Felicia took over the financial support
and daily management of her Psychotic brother's care.  I kept telling her: "Your
sister and brother need to help you pay for his care and help manage his care."
Scot called Felicia about 10 times an hour when I was there, she was so kind to him
each time she answered the phone. All these years she was the person to step up to
the plate and help Scot without any assistance from her other siblings, Carr
Matthew and sister Julie Donald.

Over the years we began meeting up at a departure point and traveling together.
During those trips she called her kids and Dad every day. In my view she was glue
that held the family together. She made sure her kids had every opportunity to be
the best they could be.  She has a son Matthew that is still in college. Her daughter
Julie is now a RN for the military and Danielle is a first time Mom of a 3 month old.

Felicia knowing when I was alone, always invited me to come to her home for
Christmas and Thanksgiving.

I know she went Guatemala on multiple trips, at her own expense, to do surgery on women that wouldn't have been able to afford Gyn Surgery in Guatemala and would have died without surgical intervention.

She has been sole caregiver of her now 90 plus year old father, for at least the last 10 years and is the only caregiver now.

I personally know she would cover any MD asking her for vacation coverage, even though they usually didn't reciprocate. She was the only person that volunteered to cover for another OB/GYN MD, diagnosed with Stage IV cancer. Felicia was trying to maintain her own office and maintain the cancer stricken MD's office at the same time, so that MD wouldn't lose her patients.

During this time, Felicia has had a serious rare Blood Cancer. I keep telling her she has to take care of the Caregiver or there will be no one left to take care of her family. She hasn't kept up with her Hematology/Oncology follow up as much as needed, as she states she didn't have the money or the time. She needs ongoing Hematology/Oncology treatment and follow up.

I am a Family Physician BUT I think Felicia has a Mental Health Disorder that has become increasingly apparent over the last 5 years. Rapid Pressured Speech, Flight of Ideas, Impulsivity and other Manic type symptoms. I think she would benefit greatly from a Board Certified Psychiatric evaluation for treatment of brain chemistry imbalance.

Sincerely,
Dr Jeanie Branconi MD
813-843-0428 mobile

447 East Scenic Drive
Grand Junction, CO 81507
719-600-1487
pdarezzo84@gmail.com


Judge Leonie M. Brinkema
c/o Dischley Law, PLLC
9255 Center Street, Suite 300B
Manassas, VA 20110


Judge Brinkema:

I am writing this letter on behalf of Felicia Donald with regards her upcoming sentencing. I have known Felicia Donald for the past forty years. We attended medical school together at Eastern Virginia Medical School in Norfolk, Virginia. After graduation, she went on to specialize in OB GYN while I specialized in Emergency Medicine. Over the years, we kept in contact, and I knew she had two divorces and two children during that time. Eighteen years later we reconnected and had a brief relationship and a son together.

Although I'm married and live out west now, I probably know her character and family situation as well as anyone.

First, Felicia has a good heart. It may sound like a cliché, but sometimes she seems to have too good of a heart and, in great part, her life has been a series of being taken advantage of by people. She is overly naïve in that respect. She often wants to please everyone and to be liked too much. I know I could ask her for anything—not just me, but almost anyone could—and she would try to do it. I know she is like that with her family, patients and employees, going overboard to try to meet their demands in ways that most of us would think ridiculous.

For the past forty years, Felicia has helped care for her brother Scottie who was diagnosed with schizophrenia as a teenager and has never been able to be employed. I have never seen Felicia act with anything but compassion for him. Now Scottie is severely overweight, suffers from diabetes, chain-smokes cigarettes and has developed severe chronic infected leg ulcers. Felicia arranges health care for him and visits several times a week. He calls her up on the phone daily only to curse at her and demand more money for his cigarettes, which she takes all in stride.

Ever since Felicia's mother died shortly after medical school, Felicia has also been her father's sole caregiver. Currently her 92-year-old father lives in her basement, which she has remodeled for him. Over the years he has helped him through numerous medical challenges, and he is always included in any family activities.

Along with supporting her daughters well into their twenties, Felicia has also, in great part, supported her older sister Julie, a one-time, small-bit actress in LA, who has been functionally unemployed for years.

I have never known Felicia to use drugs or abuse alcohol. Prior to all this in the forty years I've know Felicia, I've never heard her talk of controlled substances or show any interest in them. More recently (2014), our son Matthew got involved with drugs at Langley High School, and was failing out of school. Felicia, a single mother, when she could no longer handle the situation, sent him to live with me aware that was the best choice she could make in an attempt to do anything to keep him away from drugs.

Medically, I don't really know what kind of doctor Felicia was. I never practiced medicine in the same geographical area, but as

a physician myself, I do know that to practice medicine in Northern Virginia for thirty years without problems or censure requires a high level of competence. For close to forty years Felicia has woken up in the middle of night and rushed to the hospital to deliver a baby or perform emergency surgery, and seen tens of thousands of patients in her office. Felicia has always loved her profession. Over the years, I have heard from her about many of the uplifting deliveries she performed and the difficult surgeries along with the normal trials, ordeals, and emotional strain involved in practicing medicine. She truly cared about her patients and loved what she did.

All that said, Felicia is often gullible. She is often naïve. She sometimes has bad judgment. She doesn't always think things through. She can be easily swayed by other people's opinions or suggestions. Often—I hesitate to say it—she is just plain stupid. She has very little business sense.

Despite practicing medicine for years, her only real financial asset is her house, which has appreciated in value only due to the Northern Virginia real estate market.

Felicia is not greedy. I have never heard of her wanting a bigger house or to go on extravagant vacations. She has never wanted or had a lavish lifestyle but, despite her profession, was always simply struggling to support herself and those she cared for.

I have watched her go through multiple OB GYN business partnerships invariably working with people who took advantage of her gullibility and lack of business savvy. She has tried a number of things to supplement her income. Ones that I know of include buying some sort of fat-burning machine, expanding her practice to inject Botox cosmetically, and, I guess, more recently, a pain clinic she ran, which to my understanding, had eighteen patients.

To me as an ER doctor, anything with narcotics or "pain patients" smells of trouble, or certainly has the potential for it. But I am sure Felicia, in a somewhat lackadaisical manner, probably talked to some colleague, who suggested it was an easy way to supplement her struggling OB GYN income, and went for it. To my understanding, she had drug abusers working for her, people I would have shunned in a heartbeat, but I am sure Felicia thought she was giving them a second chance and believed everything they said. I do, however, remember Felicia being alarmed and calling me and telling me that she immediately notified the police when she discovered what her employees were doing.

Felicia isn't really smart enough to try to "get away with something", or she just doesn't think that way. Rather, I imagine she thought mistakenly anything she did just wasn't that bad, or simply one bad decision spiraled into another. She obviously didn't take the responsibilities of her medical license with regards controlled substances as seriously as she might.

In conclusion, I don't think Felicia is a bad person, or evil, or has ever been out to consciously harm anyone, or out to make a ton of money.

Rather, as is her wont, I think she was someone who was, at times, simply stupid, and suffered from bad judgment.

Respectfully,

*Paul D'Arezzo*

Paul D'Arezzo, MD

Judge Leonie M. Brinkema
c/o Dischley Law, PLLC
9255 Center Street, Suite 300B
Manassas, VA 20110

Dear Judge Brinkema,

This is a letter of support for Dr. Felicia Donald. I have known Felicia since 1977 when were met as freshmen at the Catholic University of America in Washington DC. Since then, Felicia and I have remained close friends. Over the past thirty plus years, she has helped me in many ways.

I am a professor in the College of Engineering at San José State University in San José, California. I have been at SJSU since 1990, starting as an Assistant Professor and then holding several management roles including chair of the Department of Aviation and Technology and Director of General Engineering. I am proudest of my work in increasing the retention rates of freshmen at SJSU and providing a more supportive environment for students. One person can make a difference and it is thanks to SJSU faculty, staff, and administrators that I have been able to do this work. Felicia has made a difference in my life in a profound way.

I met Felicia in our freshmen year at college in 1973. We both were students at Catholic University and took several classes together: Calculus, Chemistry, and Physics. Soon, we became fast friends and, by extension, I got to know her family and Felicia very well. I transferred to Rutgers University to finish my undergraduate degree, a BS in Chemical Engineering, and Felicia and I kept in touch throughout the years. She went on to medical school, then internship and residency and settled in Great Falls Virginia. I went on to get three Masters degrees, in two different institutions, and a PhD from the Ohio State University. Throughout these years, I saw Felicia frequently and we talked often on the phone. Felicia is a loyal friend who always keeps contact with people she knows.

One of the biggest struggles that Felicia had was losing her mother. At the time, we were both living in Northern Virginia and I was overwhelmed with the way Felicia dealt with this tragedy. During the funeral and repast, she reached out to other people and asked how they were, not considering how she felt. She and her mother were very close but Felicia is a person who cares about what other people are feeling first. When both of my parents died, I regret that I was not able to emulate Felicia's qualities of other people first. In fact, when my father died, Felicia gave me so much support that I knew she was a good friend. But, her help when I was grieving is not as important as the other support I have received from her.

My husband, Victor, and I were married in 1990. Immediately, we tried to conceive a child. After eight years, we started the adoption process. Over the next four years, we tried to adopt with the county of Alameda, California and through a private agency but, because we were older, it was difficult. This is when Felicia's kindness and concern for Victor and I came into place.

I received a phone call from Felicia in November 2002. A teenaged girl just came into her office with her mother—she was 7 months pregnant and had been hiding it. During the visit, she told

Felicia that she was giving the baby up for adoption. Felicia immediately thought of me and my husband and asked the girl if we could talk to her. The girl said yes and Felicia called me to give me her number. Over the next weeks, we had several conversations with the girl and she told us on December 23, 2002 that she wanted us to adopt her baby. She said something that I won't forget—I can trust you with my baby because you have been friends with Felicia for almost 25 years and Felicia is one of the kindest people I have met. In January 2003, Victor and I flew to Virginia and were able to witness the birth of our daughter, Taylor. Because of Felicia's love and kindness to us, we are blessed each day with a wonderful and intelligent daughter.

I can never repay Felicia for the joy she brought into our lives by helping us adopt our daughter. I have seen the kindness with which she treats other people and I am so happy that I met her at college. It is hard to believe that I have had the same friend for over thirty years. It is because of Felicia's love and concern for me that I am a mother.

I am pleased to provide this letter for Dr. Felicia Donald. I would be happy to discuss this with you in more detail.

Sincerely,

Patricia Ryaby Backer
Professor, Technology Program
Department of Aviation and Technology
College of Engineering
San José State University

EMAIL:    patricia.backer@sjsu.edu
WORK:    408-924-3214
CELL:       510-682-7434