IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 1:20-cr-100 |
| v. | Hon. Leonie M. Brinkema |
| FELICIA LYN DONALD, | Sentencing: December 1, 2020 |
| *Defendant*. | |

## UNITED STATES' POSITION ON SENTENCING

The United States of America, through undersigned counsel and in accordance with 18 U.S.C. § 3553(a) and the U.S. Sentencing Commission Guidelines Manual (the "Guidelines" or "U.S.S.G."), hereby provides its position with respect to sentencing for the Defendant, Dr. Felicia Lyn Donald ("Donald" or "the Defendant"). The government has reviewed the Presentence Investigation Report (the "PSR") and for the reasons set forth below, respectfully believes that the advisory Guidelines range should be 210 to 262 months' imprisonment, rather than 292 to 360 months' imprisonment. For the reasons set forth below, the United States submits that a sentence of 168 months' imprisonment[1] would be sufficient and not greater than necessary in this case.

## I.     BACKGROUND

In summary, Donald organized, led, managed, and operated a prescription "pill mill" from at least April 2016 through April 2020. Donald owned and practiced medicine at For Women

---

[1] This recommendation carefully takes into account all of the § 3553(a) factors, and other sentences that this Court imposed in serious opioid distribution cases, such as *United States v. Louise S. Edwards*, 1:18-cr-155 (Brinkema, J.) and *United States v. Gurpreet Singh Bajwa*, 1:20-cr-60 (Brinkema, J.). As the Court knows, the defendants in both cases (one of whom was not a doctor) each received sentences of 120 months, had considerably lower Guidelines ranges than Donald, and did not engage in obstructive post-plea conduct, as Donald did in this case.

OB/GYN Associates and NOVA Addiction Center.  During the period of the charged conspiracy, Donald, with the assistance of at least five other individuals, illegally distributed and dispensed, and caused to be illegally distributed and dispensed, at least 325,190 mg of Schedule II controlled opioids, including over 296,000 mg of oxycodone, in addition to hydrocodone, morphine sulfate and methadone.  As the leader and organizer of the conspiracy, Dr. Donald distributed over 1,200,000 milligrams (mg) of Schedule II opioids at or above the CDC guideline for dosages that a practitioner "should avoid," with a total street value of over $1.2 million.  Donald also admitted that she committed health care fraud in furtherance of her scheme.

Donald further admitted that she prescribed opioids to addicts and/or drug dealers who had traveled from out-of-state or long distances to her practice; individuals that informed Donald of their pending drug charges; individuals who Donald knew had failed urine toxicology screens; individuals who Donald knew were selling the pills that she prescribed to them; paying certain employees, in part, with opioid prescriptions rather than through pay checks; and giving blank prescriptions to certain members of her medical office staff and other co-conspirators for their personal use.

Donald attempted to conceal her patterns of illegal prescribing by falsifying medical records to make it appear as though individuals who were never her patients received examinations and medical care, when in fact they had not, and engaging in Medicaid fraud.  Donald fraudulently issued prescriptions to others in the names of at least nine unwitting individuals, none of whom were her patients.  Donald also issued prescriptions for high doses of oxycodone to multiple women who were pregnant.

On May 4, 2020, Donald pleaded guilty in this Court to conspiracy to distribute and dispense Schedule II controlled substances outside the usual course of practice and without a

legitimate medical purpose, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and health care fraud, in violation of 18 U.S.C. § 1347.

## II.      APPLICATION OF THE SENTENCING GUIDELINES

The government concurs with the U.S. Probation Office's calculations, with one notable exception.  As further discussed below, the government hereby recommends and moves the Court apply the three-point reduction for acceptance of responsibility under U.S.S.G. § 3E1.1.  The United States and the defense agree that the Defendant deserves a two-level decrease in her offense level because the Defendant has assisted the government in the investigation and prosecution of the Defendant's own misconduct by timely notifying authorities of the Defendant's intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently.  The government also agrees that, pursuant to Section 3E1.1(b) of the Sentencing Guidelines, the Defendant deserves an additional one-level decrease in the Defendant's offense level.

On November 17 and 18, 2020, the defense informed the government in writing that, if the government recommends to the Court that the Defendant should receive the three-level Guideline reduction for acceptance of responsibility, the defense fully agrees and understands that both sides may argue for or against the application of any and all enhancements, such as obstruction of justice, and that any arguments whatsoever pursuant to 18 U.S.C. Section 3553(a) or the Guidelines will not be considered a breach of the May 4, 2020 plea agreement by either the government or the defense.  The government concurs.  The defense and the government also fully agree and understand that the Court's rulings on the Guideline calculations at the upcoming sentencing hearing is a matter of the Court's discretion entirely, and that neither side will later claim or indicate that the May 4, 2020 plea agreement was breached in any way based on what the Court decides to

do at the sentencing hearing, even if that means the Court and/or the U.S. Probation Office rejects the joint recommendation of the government and the defense that the Defendant should receive the three-level Guideline reduction for acceptance of responsibility and/or finds that the Defendant has breached the plea agreement.[2]

The application of the three-point reduction for acceptance of responsibility would result in a Total Offense Level of 37 rather than 40.  Taken together with a Criminal History Category I, the applicable Guidelines range should be 210 to 262 months' imprisonment, rather than 292 to 360 months' imprisonment.  The Government offers the following observations regarding the enhancements that were correctly applied by Probation.

1. **_Abuse of Trust (U.S.S.G. § 3B1.3))_**

Section 3B1.3 provides for a two-level enhancement if "the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense."  The "central purpose" of this increase is "to penalize defendants who take advantage of a position that provides them with the freedom to commit a difficult-to-detect wrong."  _United States v. Agyekum_, 846 F.3d 744, 753 (4th Cir. 2017).  A position of "public or private trust" is a position characterized by professional or managerial discretion, for example, substantial discretionary judgment that is ordinarily given considerable deference.  U.S.S.G. § 3B1.3, cmt. n.1.

There is no dispute that Donald was a licensed medical doctor at the time of the offense. The Defendant had an active DEA registration number that allowed her to distribute and dispense, and caused to be illegally distributed and dispensed, at least 325,190 mg of Schedule II controlled

---

[2] The government and the defense's agreement is this case is limited to the _sui generis_ facts and circumstances of this specific case only and should not be read to indicate that the same agreement or arguments should or would be made in a future, unrelated case.

opioids.  As a doctor, Donald occupied a position of public or private trust; she had been granted a professional license to safely and responsibly prescribe controlled substances, including dangerous opioids, which would normally be given considerable deference.  By abusing that license and unlawfully prescribing those medications, Donald abused that trust in a manner that allowed her to conceal and facilitate the offense.

Alternatively, Application Note 2(B) states that this enhancement "shall" apply to "[a] defendant who exceeds or abuses the authority of his or her position in order to obtain, transfer, or issue unlawfully, or use without authority, any means of identification."  That is precisely what Donald did in this case.  As paragraph 11 of the Statement of Facts ("SOF") notes, Donald fraudulently issued "prescriptions to customers in the names of at least nine unwitting individuals, without lawful authority."  This conduct is certainly qualifies as an abuse of trust given that it is analogous to, but even more egregious than, "a hospital orderly who exceeds or abuses the authority of his or her position by obtaining or misusing patient identification information from a patient chart."  U.S.S.G. § 3B1.3, cmt. n.2.

## 2. *Organizer or Leader (U.S.S.G. § 3B1.1(a))*

Section 3B1.1(a) includes a four-level increase "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants . . . ."  Paragraph two of the SOF states that Donald "practiced medicine at For Women OB/GYN Associates and NOVA Addiction Center, both of which she owned and operated in the same location in the Eastern District of Virginia."  The government agrees with Probation that, as the only licensed medical practitioner involved in the offense, she had authority and control over the issuance of prescriptions, billing, and stood to benefit the most from the offense.  Donald knowingly employed

opioid addicts, including Kimberly Lancaster and Susan Alcantara (both of whom pleaded guilty on March 30, 2020 before this Court), and rewarded them for their assistance in opioids.

Furthermore, paragraph one of the SOF states that Donald was the "leader and organizer of the conspiracy" and that "[f]rom at least in or around April 2016 and continuing to in or around April 2020, Donald, with the assistance of <u>at least five other individuals</u>, illegally distributed and dispensed, and caused to be illegally distributed and dispensed, at least 325,190 mg of Schedule II controlled opioids, including 297,860 mg of oxycodone, in addition to hydrocodone, morphine sulfate and methadone" (emphasis added).  Paragraph two of the SOF emphasizes this point and states that Donald "organized, led, and operated a prescription 'pill mill' in the Eastern District of Virginia, at which so-called 'patients,' many of whom were actually cash-paying customers, could obtain medically unnecessary prescriptions, including Schedule II controlled substances, outside the usual course of professional practice and without a legitimate medical purpose."

Alternatively, under Section 3B1.1(a), the four-level enhancement also applies if the criminal activity at issue "was otherwise extensive."  Application Note 3 indicates that, "[i]n assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered.  Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive."  The SOF contains overwhelming evidence that Donald's criminal activity was "extensive."  As one example only, paragraph 11 of the SOF notes that Donald fraudulently issued "prescriptions to customers in the names of <u>at least nine unwitting individuals</u>, without lawful authority.  Consequently, in this manner, from January 2017 through June 2019, Donald fraudulently distributed at least 22,737 Schedule II opioids, or 241,670 mg (including 237,470 mg of oxycodone)" (emphasis added).

### 3.   *Specific Offense Characteristic (U.S.S.G. § 2D1.1(b)(16)(B))*

Given that Donald has received an adjustment under Section 3B1.1, the government fully concurs with Probation that Donald is deserving of the two-level enhancement under Section 2D1.1(b)(16)(B).   As described in the SOF, Donald prescribed and/or distributed controlled substances to individuals she knew were particularly susceptible to criminal conduct because they were addicts and/or drug dealers who had traveled out-of-state or long distances to her practices, had failed urine toxicology screens, and/or were selling the pills she prescribed to them.   Donald also illegally gave blank prescriptions (scripts) to certain members of her medical office staff and other co-conspirators for their personal use.

This enhancement is also supported by paragraph 6 of the SOF in this case given that Donald admitted to issuing prescriptions for high doses of oxycodone to women who were pregnant, including to Susan Alcantara.   The SOF in Alcantara's case (1:20-cr-81; *see* Dkt. No. 8) further corroborates the application of this enhancement, to include paragraph five: "[Donald] was aware of Alcantara's addiction problems, but nonetheless prescribed Schedule II controlled substances to Alcantara and others in ways that caused dependence and addiction.   [Donald] issued prescriptions for Schedule II controlled substances in dosages and/or in combinations dangerous to the health and safety of patients, including opioids in excessive and escalating amounts, rather than providing alternative means of addiction treatment."

### 4.   *Obstruction of Justice (U.S.S.G. § 3C1.1)*

As described in Paragraphs 13-14 and 53 of the PSR, Donald attempted to willfully obstruct or impede the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction when she contacted CC-1 and CC-2, despite being ordered by the Court to have no contact with any coconspirators or potential witnesses at her May 4, 2020,

plea hearing.  On August 7, 2020, Donald appeared before the Court, at which time she stipulated to the allegations contained in the Notice of Apparent Violation and Petition for Action on Conditions of Pretrial Release filed on July 16, 2020.  As the PSR notes, Donald had been aware CC-1 and CC-2 were considered co-conspirators since at least April 17, 2020.

Application Note 4(A) lists "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so" as an example of conduct to which an adjustment under Section 3C1.1 applies.  On May 11, 2020, just seven days after this Court accepted her guilty plea and warned her "to avoid any contact with any of the known coconspirators or potential witnesses" in the case (*see* page 44 of the plea hearing transcript attached to Dkt. No. 39, Ex. 4), the defendant sent an email to CC-2, in which she stated, "This is what needs to be disproved in the sentencing in August.  You are listed in the statement of facts, Tell me how you will disprove this.  Felicia."  No one else was copied on this correspondence.  *See* Dkt. No. 39, Ex. 3.  The government concurs with the Probation officer that this is a clear indication that Donald was attempting to influence CC-2 to provide her assistance in discrediting Donald's May 4, 2020 SOF and unduly influence her prosecution and sentencing in this case.  The government adds that Donald's conduct also amounts to an attempt to obstruct the government's ongoing investigation into CC-2.

## III.    SECTION 3553(a) FACTORS

After calculating the appropriate advisory Guidelines range, the court must "determine whether a sentence within that range . . . serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors."  *United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006).  Title 18, United States Code, Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well

as the history and characteristics of the defendant.  Additional factors outlined in § 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2)(A)-(D).  Based on a careful consideration of those factors, a sentence of 168 months' imprisonment is reasonable in this case.

## A.    Nature and Seriousness of the Offenses

Donald was the criminal mastermind behind the brazen conduct detailed in the lengthy SOF.  As a doctor, she blithely violated her critical position of trust.  For a period of four years, Donald served as the pipeline that spread unnecessary, addictive, and dangerous opioids and other drugs into the communities in which she saw patients, ignoring their medical needs and feeding into their crippling addictions.  Donald's actions risked the lives of anyone who purchased these potentially lethal drugs.  Donald committed this recklessly dangerous conduct despite her medical training and experience, betraying the trust placed upon her by both her patients and the public.

Given the ongoing opioid epidemic and COVID-19 pandemic that are ravaging our communities, it is critical that other doctors and medical professionals who are contemplating flouting their positions of trust understand that such egregious conduct will face significant punishment.  According to the Centers for Disease Control and Prevention, "[o]verdose deaths involving prescription opioids were more than four times higher in 2018 than in 1999."  *See* https://www.cdc.gov/drugoverdose/data/prescribing/overview.html (last visited Nov. 24, 2020). In fact, 67,367 drug overdose deaths occurred in the United States in 2018 (2019 data is not yet available).  Nearly   70%   of   those   deaths   involved   an   opioid.   *See*

https://www.cdc.gov/drugoverdose/epidemic/index.html (last visited Nov. 24, 2020). Donald significantly contributed to this serious public health crisis, repeatedly and without any hesitation or remorse, until she and the co-conspirators whom she employed and/or directed were caught.

Importantly, Donald's criminal activity was not limited to the two offenses to which she pleaded guilty. As the SOF describes, her conduct violated a number of other federal statutes. The government exercised its discretion to refrain from charging Donald with those crimes (to include multiple counts of wire fraud, false statements, maintaining drug-involved premises, various other conspiracy-related crimes, and mandatory minimum offenses, such as at least nine counts of aggravated identity theft). While the government exercised its discretion to refrain from charging Donald with those offenses given her early acceptance of responsibility and other considerations specific to this case, the nature and seriousness of the Defendant's crimes merit a sentence of 168 months' imprisonment – which is still 42 months below the very bottom of her corrected Guidelines range.

Donald illegally distributed controlled substances, by: (1) repeatedly fueling patients' addictions by continuing to prescribe highly addictive opioids, while ignoring obvious warning signs that these individuals were abusing or illegally distributing the medications; (2) prescribing controlled substances without conducting physical examinations; (3) failing to conduct diagnostic testing, failing to turn drug-seeking patients away, and failing to refer patients for addiction treatment; (4) issuing prescriptions for controlled substances in dosages and/or in combinations dangerous to the health and safety of the patient, including the combination of opioids and alprazolam and; (5) issuing prescriptions for Schedule II opioids, including oxycodone, to multiple women who were pregnant. The following additional examples illustrate the nature and seriousness of Donald's offenses, which spanned four years (April 2016 – April 2020):

- Donald illegally distributed and dispensed, and caused to be illegally distributed and dispensed, at least 325,190 mg of Schedule II controlled opioids, including 297,860 mg of oxycodone, in addition to hydrocodone, morphine sulfate and methadone;

- To prevent any delay in receiving payment by filing insurance claims and to avoid scrutiny of her prescribing practices, Donald typically charged $200 cash per "visit" for "pain patients" to obtain prescriptions or refills of Schedule II controlled substances;

- Donald carried out the conspiracy by intentionally employing individuals who were addicted to pain pills, including oxycodone, and "paying" those employees, in part, with oxycodone prescriptions and other Schedule II opioids, rather than through pay checks;

- Donald attempted to conceal her patterns of illegal prescribing by falsifying medical records to make it appear as though patients and individuals who were never patients of her practice received medical examinations and medical care, when in fact they had not;

- Donald fraudulently issuing prescriptions to customers in the names of at least nine unwitting individuals, without lawful authority;

- On several occasions, Donald illegally transported marijuana from California to Northern Virginia.  Donald subsequently distributed the drug to at least six members of her office staff, including individuals she knew were addicted to opioids;

- Donald  knowingly submitted and caused to be submitted fraudulent billing claims to the Virginia Medicaid Program on several occasions; and

- Donald submitted fraudulent Medicaid claims for pain related office visits for patient B.N., who Donald knew was seeking to obtain prescription opioids that B.N. could distribute on the street for profit.

## B.    History and Characteristics of the Defendant

Donald is a highly intelligent and educated 65-year-old former physician.  She graduated from Langley High School in McLean, Virginia (one of the most highly rated high schools in the country), earned a Bachelor of Arts degree from The Catholic University of America in Washington, D.C., reportedly earned a Master of Science in Physiology degree from Georgetown University in Washington, D.C., and was awarded a Doctor of Medicine degree from Eastern Virginia Medical School in Norfolk, Virginia.  PSR ¶¶ 88, 108-11.

Donald reported that she was raised by both parents.  She did not experience any abuse or neglect during her childhood, and noted that her physical and emotional needs were always met. *Id.* ¶ 89.  The government recognizes that Donald has endured certain challenges in her life and acknowledges those circumstances.  *See id.* ¶¶ 92, 94, 101.  However, Donald took advantage of the trusted relationships that she had built to dangerously violate the law at the expense of the patients that she was entrusted to serve.  And while it is true that Donald does not have any prior convictions, it is equally true that she has a sophisticated criminal mind and clearly knew the consequences of her actions.  Otherwise, she would not have deliberately and fraudulently distributed at least 22,737 Schedule II opioids, or 241,670 mg (including 237,470 mg of oxycodone), without lawful authority by issuing prescriptions in the names of at least nine unwitting individuals, none of whom were her patients.

In fact, her first brush with authorities came over a decade ago in 2010 when Virginia Medicaid conducted an audit of medical claims paid to Donald between April 1, 2008 and March 31, 2009.  Certain medical codes reimburse practitioners at higher rates because the code requires a higher level of complexity to be rendered and documented during the patient visit.  Medicaid concluded that Donald was overpaid $954.05 for medical claims which did not meet or document the medical code complexity requirements.  Donald appealed the audit and held an informal fact-finding telephone conference with a Medicaid representative on May 27, 2010.  During this conversation, Donald argued that, "you can't see people for $25, <u>and pay your employees and your electric bill</u>, and everything else, so I am going to say this is a level four (99214) (emphasis added)."  Rather than learning from those fraudulent actions, Donald engaged in far more serious and pervasive criminal conduct in the coming years, culminating in this prosecution.

Accordingly, Donald's positive upbringing, intelligence, education, training, and ample career opportunities should weigh in favor of holding her to an exacting standard.  If anything, her background is aggravating, not mitigating.  Donald has had opportunities that were never within reach of many offenders who come before this Court.  The sentence must account for the fact that Donald had these opportunities, but repeatedly chose to break the law nonetheless.  It is Donald's serious crimes and recklessly dangerous conduct that should be the Court's lodestar at sentencing.

**C.     The Defendant's "Expert" Reports Reflect Advocacy Masquerading in Science**

Despite knowing about the sentencing date in this case for months, to include multiple continuances, the government received from the defense three lengthy "expert" evaluations on the eve of sentencing, one of which was sent to the government yesterday and the other two this afternoon – just hours before this sentencing memoranda must be filed.  Neither the defense nor the "experts" upon whom the defense is now relying for mitigation provided the government with any of the materials underlying the supposed evidence that was used to generate these reports, including photographs and any test results, data, or other records supporting their questionable conclusions.

Based on a preliminary review of the defense's "expert" reports, many of the bald assertions contained therein appear to have been formed based on a cursory review of only certain evidence in this case, numerous self-serving statements from Donald herself, and a limited number of interviews with individuals (such as family members) who are understandably sympathetic to Donald and her current predicament, all of whom the defense hand-picked.  For example, perhaps to achieve a desired outcome, Dr. Hyde only interviewed Donald and three other individuals, two of whom are Donald's own children.  Yet, none of those individuals were privy to Donald's extensive crimes when she was boldly acting as a bona fide narcotics trafficker because Donald

13

deliberately chose to hide that side of herself from them.  *See United States* v. *McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003) ("excellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her").

Another so-called expert upon which the defense relies is Dr. Susan J. Fiester.  This Court should know that at least two other federal courts have expressed serious concern with Dr. Fiester's prior reports.  In a published opinion, the U.S. District Court for the District of Nevada stated the following:

> The reliability of Doctors Fiester and Van Gorp's reports is suspect.  Bypassing numerous psychiatrists and psychologists nearby, Defendant employed two doctors from the East who are particularly known to the criminal defense bar for producing favorable opinions and diagnoses.  Given Defendant's obvious motivations in retaining these professionals and the doctors' history of testifying favorably for similarly situated criminal defendants, the opinions of these doctors should not be relied upon as "newly discovered evidence" mandating a new trial.  It is no accident that Defendant chose Dr. Fiester and Dr. Van Gorp among all the available mental health doctors in the nation.  Both individuals have been extremely active in testifying for criminal defendants across the country.  Dr. Fiester, for instance, admits that she has participated in more than 700 forensic cases.  A quick case search reveals that both doctors have testified in literally dozens of cases that criminal defendants of all types possess mental and/or behavioral problems that caused the underlying criminal behavior . . . . their reports and conclusions must be examined in light of their motives, bias, history with the criminal defense bar, and, most importantly, the other evidence regarding Defendant in this case.  The considerable evidence produced in this case during discovery and trial does not comport with the picture painted by these doctors' new reports.

*United States v. Flaherty*, No. 2:04-CR-0084-RCJ-RJJ, 2007 WL 869602, at *6–8 (D. Nev. Mar. 20, 2007), *aff'd*, 270 F. App'x 666 (9th Cir. 2008).

In another published opinion, the U.S. District Court for the Northern District of Iowa stated the following about Dr. Fiester, which is equally applicable in this case:

> The court finds the opinion testimony of Susan J. Fiester, M.D., to be unsupported by any credible and independent evidence.  Dr. Fiester was called as a mitigating expert witness, not as a treating physician.  In fact, she apparently did not even know Defendant during the relevant time period.  Her opinions are based nearly exclusively on interviews of Defendant

and his wife, both of whom have their own motivations in this case. Further, the court notes that, during the trial and the sentencing, many people described Defendant's behavior as energetic and cheerful during the relevant time period. But, even if the court were to assume for the sake of argument that Defendant was depressed during the commission of the criminal offenses, there is no credible evidence that depression impaired his judgment and attention in any relevant respect. In fact, the contrary is true. The court declines to vary on this ground.

*United States v. Rubashkin*, 718 F. Supp. 2d 953, 986 (N.D. Iowa 2010).

The defense's so-called "experts" appear to be straining medical terms and concepts to achieve desired outcomes, *i.e.*, arguing that because Donald flagrantly violated her oath as a doctor and committed egregious crimes for four years, she must have cognitive defects that are mitigating in this case. Moreover, a central conclusion from these reports is that Donald suffered from "impaired judgment" while she was engaging in serious criminal conduct for the past several years. With all due respect to these so-called "experts" – but the notion that a doctor who traded in her white coat to act as a drug dealer under the guise of a professional medical practice by fueling patients' addictions for $200 cash per visit or prescription had "impaired judgment" – is unremarkable and amounts to nothing more than advocacy masquerading as science.

The following excerpted text message exchange between Donald and CC-2 from November 16, 2016 is one example of many that easily refutes any specious argument that Donald's drug distribution conduct was anything but knowing and intentional.

> **CC-2**: *No money to do shit... not even get a massage which is $15 or have a glass of wine which is $5. I use up $10 on Uber everyday so I'm flat broke [note: three unrelated text messages were omitted for clarity]*

> **Felicia Donald**: *I'm getting [another doctor] to write the script and will put it in the mail*

> **CC-2**: *Thanks so much!!!! [note: the rest of this message and the next message were unrelated, so both were omitted]*

> **Felicia Donald**: *She only wrote for 45 tablets she was giving me shit*

> **Felicia Donald**: *I'll sending it in the mail to your house today*

**CC-2**: *Thanks.  Why was she giving you shit 45 or 90 is the same price for me*

**CC-2**: *And I'm allowed 90 for 90 days*

**CC-2**: *At least she agreed to that*

**Felicia Donald**: *Idk*

**CC-2**: *She's f....cked up.  I*
*I'm not an addict but little does she know it's for living expenses*

**Felicia Donald**: *I know*

**CC-2**: *As a matter of fact I think the last time I took a pill was a month ago [note: the rest of this text message was unrelated and omitted]*

**Felicia Donald**: *Don't worry just spoke to [CC-1] and will write her for 6O [sic] Vic's tomorrow so you will have 105 tablets*

**Felicia Donald**: *I'll sent you the script for 45 and then get the other 60 from [CC-1]*

**CC-2**: *Fantastic.  Does she want more gummy bears or green?*

In the above message exchange, CC-2 stated that the pills were to fund her "living expenses" and that she has only taken one pill in the last month, implying the rest of the pills were sold rather than consumed by CC-2.  Moreover, this message shows that Donald was aware that CC-2 was selling the narcotics that Donald illegally provided to her.  CC-2 also asked Donald in the above message if CC-1 would like gummy bears or green, which likely refers to edible marijuana and leafy marijuana, respectively.

As another example, during a September 2019 recorded, non-custodial interview with the FBI in her office, Donald admitted that she prescribed narcotics to an individual without seeing him or conducting any corresponding medical examination.  During the recorded interview, while laughing, Donald stated that, "I know that's a no no."  And recently, the FBI learned from recorded jail calls that Donald and CC-2 have spoken to each other on numerous occasions since August 7,

16

2020, contrary to this Court's Order; (2) that Donald is sending letters to CC-2 through the mail because she believes that no one will review them; and (3) that Donald developed the use of a code word to refer to CC-2 when talking to CC-2 through her family members.

These examples, and many others, effectively rebut any argument that Donald's alleged medical issues have affected her judgment and ability to recognize her own criminal conduct.  By all accounts, Donald is an intelligent individual who is fully capable of taking control of her own destiny.  She had the power to make his own choices, and repeatedly made the wrong decisions (until she was caught) that have brought him before this Court.  This is a defendant who knowingly violates the law, attempts to use countermeasures to evade law enforcement detection, and believes she can continue to commit crimes with impunity.

**D.      Lancaster and Alcantara's Conduct is Not Comparable to Donald's Conduct**

As the Court knows, Donald is one of three defendants who have pleaded guilty to date in connection with this matter.  The other two defendants (Kimberly Lancaster and Susan Alcantara) pleaded guilty on March 30, 2020.  As Lancaster and Alcantara's SOFs demonstrate, their conduct pales in comparison to Donald's sweeping and extensive conduct in this case, over which she exercised a leadership and managerial role for four years.

Neither Lancaster nor Alcantara are doctors or even nurses.  They were Donald's patients, worked directly for her during various stages of the conspiracy rather than the entire period of the conspiracy, and they depended heavily on Donald to sustain their serious addictions to opioids.  In Lancaster's case, for example, Donald paid her salary, in part, through the issuance of highly addictive and medically unnecessary opioids.  Donald preyed on their vulnerabilities and, as the only physician involved, clearly served as the leader of the charged conspiracy.  Moreover, as the Court and defense counsel knows, there are under seal reasons why their cases are entirely

inapposite to Donald's case. The sentences imposed in Lancaster (Guidelines range of 41 to 51 months) and Alcantara's (Guidelines range of 0 to 6 months) cases should have little bearing on Donald's sentence, who is facing a Guidelines range of 210 to 262 months' imprisonment.

**E.    Donald's Obstructive Conduct and Numerous Violations of this Court's Order**

As the Court knows from Dkt. No. 39, paragraphs 11-19 of the PSR, the allegations to which the Defendant stipulated in the Notice of Apparent Violation and Petition Action on Conditions of Pretrial Released filed on July 16, 2020, and the August 7, 2020 hearing, Donald intentionally and inexcusably committed numerous violations of this Court's May 4, 2020 Order, which the Court should take into account under § 3553(a) to impose a significant sentence.

For example, on July 19, 2020, just three days after the defendant was arrested for violating this Court's Order Setting Conditions of Release, Donald called CC-2 using a consensually recorded phone line from the Alexandria Detention Center. During that conversation, Donald discussed the underlying allegations surrounding her arrest, admitted that she performed a sonogram on a patient "on May 14" who paid her "$200," admitted that she "made it up" when informing officials that "she was exposed to somebody with COVID." Donald committed a serious fraud on the Court which led to the rescheduling of this hearing from July 24 to August 7, a serious fraud on the Alexandria Detention Center and the dedicated officials there who had to take certain measures to keep the facility and other inmates safe in light of Donald's false statement, and a serious fraud on the FBI. Regrettably, one of the FBI agents who was exposed to Donald during the July 16, 2020 arrest was forced to quarantine in a hotel room for nearly two weeks away from his family because that agent has an immunocompromised child at home.

In addition to the above serious conduct, Donald committed the following violations of this Court's order following her guilty plea: (1) Donald corresponded with CC-2 on May 11, 2020 in

an attempt to influence CC-2 to provide assistance in discrediting Donald's May 4, 2020 SOF and unduly influence her prosecution and sentencing in this case, along with an attempt to obstruct the government's ongoing investigation into CC-2; (2) Donald conducted an ultrasound on a patient on May 16, 2020; acted like her doctor during the May 16 visit by providing her with medical advice; did not inform her of the guilty plea or that she could no longer practice medicine; and instructed the patient that she had to pay for the visit with $150 cash, but could not provide a receipt because the office computer was purportedly down; (3) Donald repeatedly contacted CC-1 through hundreds of text messages and phone calls; and called the INOVA Fairfax Hospital Emergency Department, identified herself as a doctor, gave the impression to hospital personnel that she was CC-1's physician, and attempted to speak with her at that time; (4) Donald made a false certification under penalty of perjury on May 16, 2020 to the Small Business Administration ("SBA") to obtain a loan in light of the COVID-19 pandemic, including failing to inform the SBA about her guilty plea and conviction in this case; and (5) Donald fraudulently used at least approximately $21,244.75 in SBA loan and/or Cares Act Paycheck Protection Program loans to fund her personal-related expenses, including thousands of dollars in legal fees related to this case.

## F.       Need for Deterrence

Deterrence is particularly critical here because, given the discretion afforded to medical professionals like the Donald, it is difficult to detect, investigate, and prosecute these schemes. Much of the conduct takes place behind closed doors, or is cloaked in an alleged doctor-patient relationship. On their face, the prescriptions appear legitimate, and it is all too easy for medical professionals to mask their illicit activity with seemingly legitimate medical notes. This means that when such a scheme is uncovered, and the leader of an extensive conspiracy is successfully prosecuted and convicted, a substantial and lengthy sentence is warranted. *See, e.g., United States*

*v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks omitted)

The SOF and voluminous evidence in this case clearly demonstrates that Donald's conduct was not driven by a momentary lapse in judgment or inadvertence.  Rather, her systematic and dangerous crimes continued for four years, undeterred.  It is critical that other medical professionals, particularly physicians who are contemplating flouting their critical positions of trust, understand that the consequences of putting the health and safety of the American public at risk are significant.  This is especially true at this very moment when we are relying on doctors and others to save lives during the ongoing opioid epidemic and COVID-19 pandemic.

## <u>CONCLUSION</u>

For the foregoing reasons, the government believes that its sentencing recommendation of 168 months' imprisonment is sufficient, and not greater than necessary in this case

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:     _/s/ Raj Parekh_____
Raj Parekh
First Assistant United States Attorney
Monika Moore
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia

2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3700
raj.parekh@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on November 24, 2020, I filed the foregoing with the Clerk of Court

using the CM/ECF system, which will send a notification of such filing to all counsel of record in

this matter.  I further certify that I will provide a copy of the foregoing to the United States Probation

Officer assigned to this matter.

 /s/  Raj Parekh
Raj Parekh
First Assistant United States Attorney