## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

**UNITED STATES OF AMERICA :**

    **v.**                **:**       **Case No. 1:20-cr-100**

**FELICIA DONALD**       **:**

    **Defendant**         **:**       **Under Seal**

### DEFENSE POSITION ON PRESENTENCE REPORT REDACTED

FELICIA DONALD, through counsel, provides this Memorandum to this Court to aid it in deciding the appropriate sentencing guideline calculation in this case. The appropriate calculation for this case is Level thirty-one (31) and Category I, which results in a range of 108-135 months. A four level leadership enhancement under 3B1.1(a), adjustment for victim under 2D1.1(b)(16)(B), and the obstruction of justice enhancement under 3C1.1 are not appropriate in this case. Acceptance of responsibility under 3E1.1 does apply as does abuse of a position of trust under 3B1.3. She has no criminal history and is a Category I.

### LEADERSHIP ROLE

A four level enhancement, under the facts of this case, is not appropriate for Felicia. The applicability of §3B1.1 looks holistically for all relevant conduct attributable to the defendant under §1B1.3. *See* USSG §3B1.1,

comment (backg'd) ("This section provides a range of adjustments to increase the offense level based upon . . . the degree to which the defendant was responsible for committing the offense.)  Generally, this enhancement is applied to leaders of large-scale dealing organizations with a hierarchal structure of bosses and lieutenants who control a network of underlings.  This was a pain practice of about 23 patients with a number of drug abusers who were obtaining medications for their own personal use.  It was not a street dealing operation like that of Dr. Darron Simon, where street dealers were recruited for him and he had operators working for him in Virginia, Maryland, and the District of Columbia.  *See U.S. v. Simon*, Docket No. 1:14-cr-300-001 (EDVA- Alexandria 2015).

Application Note 4 provides a recognized list of factors for courts to consider regarding this application, including: the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. *See also U.S. v. Graham*, 162 F.3d 1180 (D.C. Cir. 1996).

- 2 -

A.     **3b1.1 Factors Under Note 4.**

1.      **Decision Making Authority**

Felicia Donald opened her pain practice without the intent to violate the law. However, she would write prescriptions for practically anyone who came to her practice for the medication they wanted. She did not advertise or solicit people to her practice; instead, word got out to some that she was free with her scripts and people would come to her for that reason. .                                                        The pain practice was a secondary practice, behind her OB/GYN practice, which took most of her attention. She was not monitoring her pain practice as she should have done.

Someone would suggest to Donald that she write prescriptions in the name of a friend or family member so they could obtain the drugs for themselves. Donald would comply with their suggestions. One example is her writing scripts for people such as Tim White at Lancaster's suggestion, so that Kim Lancaster could obtain those medications for herself. The same happened with Terry Daniels.

Additionally, in her interview of February 14, 2020, Stephanie Donaldson told the agents that Lancaster suggested that Donald write a prescription in the name of her daughter, Anna Donaldson. .                                                        Donaldson's husband had lost

- 3 -

employment and health insurance, and Stephanie could not get prescriptions from the pharmacy anymore by paying with cash, so she needed a prescription in someone else's name. At Lancaster's suggestion, she asked that it be filled in her daughter Anna's name. As soon as her husband became insured again, this arrangement ended. Donaldson realized it was illegal, but was in such pain, that she did it anyway, because she simply could not work without the pain medication she was getting from Donald.

Felicia Donald's mental issues, addressed in the defense Sentencing Memorandum and in Dr. Hyde's and Dr. Fiester's reports, show that Felicia's ability to make meaningful, well considered decisions was impaired.

## 2.    Nature of Participation In Offense

Felicia Donald, as the doctor, was the one with access to the medications. She was a necessary component. Just because one is a supplier that does not justify the four level enhancement suggested in the Pre-Sentence Report. This was not a structured, multi-layered, hierarchical drug organization. Felicia is not at the level of a drug kingpin, cartel leader, or others who direct and operate street sale networks. She was not controlling patients; they came to her, and she would give prescriptions to them that she should not have written. Being an important, or even essential figure, does

- 4 -

not justify this four level enhancement.  *See, e.g., U.S. v. Roberts*, 14 F.3d 502,

523 (10th Cir. 1993).

Felicia was not organized, as both Lancaster and Alcantara

reported to the agents.  Felicia could not maintain files, and sometimes when

a patient was coming in, she could not remember what should go into their file.

Felicia did not take the steps to conceal

her actions that even an unsophisticated criminal would have done to avoid

detection.  She had papers all over, unorganized files, and poor patient notes.

Even after a board complaint in 2018 and being admonished for her poorly run

practices, she still was not able to take the steps necessary to adjust her

practice.

Some files were put together by Lancaster but Donald was not

aware of how poor quality they were.  She was not paying the attention she

should have.  When Donald gave her files to the agents, at their request, in

September 2019, she was not fully aware of how badly they were maintained,

extremely disorganized, and incomplete.  Donald often did not take needed

notes and could not remember what had happened with a patient when it came

time for charting or actions in the case.                                        .

.         Other criminals' practices would have taken precautions to

make it at least look like they were complying, especially after the eyes of the medical board were on them.  Felicia Donald did not and, indeed, was not capable of thinking ahead and becoming organized due to impaired ability to function.                                        .  Lancaster told the agents she thought Donald has suffered a breakdown.                                      .  She was right about the impairment she observed.

### 3.    Recruitment of Accomplices

Kim Lancaster asked Felicia for a job as a receptionist at the pain practice, and Felicia agreed.  Lancaster would suggest that Donald write prescriptions for her friends and family and Lancaster would then obtain those pills by filling those prescriptions as well as filling her own prescriptions to sadly fuel her own habit and addiction.  Years before, Lancaster had obtained her pills from Dr. Oraee until his arrest in 2014.  In 2014 she saw Dr. Fruiterman, and he was her doctor for a year and a half.  Lancaster relapsed into drug abuse and went to work with Dr. Donald in 2018.  The unfortunate struggles that Kim Lancaster had with drug addiction created a perfect storm in Dr. Donald's practice.

Susan Alcantara had worked for Donald before in her OB/GYN practice, and was also a patient.  In early 2018, she left because of a difficult pregnancy.  After a healthy delivery, she returned to work as a phlebotomist

for a New Jersey blood lab for Dr. Donald's practice in September-October 2018. Susan had begun using opiates at 22 because of back and knee pain. According to her, 2017 was her heaviest period of abuse. She made use of the easy access to prescriptions in Donald's practice and used the names of family members to get extra prescriptions. Donald accused her of writing her own prescriptions from one of Donald's pads in June 2019 and fired her.

.                                        At that point, Alcantara recognized the severity of her own addiction, stopped using opiates "cold turkey", and, to her credit, got help to recover.

### 4.    Claim to A Larger Share

Felicia Donald charged a flat rate to patients. There were no kick-backs or percentages that went to Donald, because this is not what one would call a street sale case. The government acknowledges that Donald only made $23,800 during the conspiracy, but per the statement of facts, placed the street value of the medications at 1.2 million dollars. Donald cannot be said to have a claim to the larger share, because according to the math here, she received less than two percent of the "value" of the conspiracy.

### 5.    Participation and Planning

While it was Felicia who started the pain practice in the summer of 2018, it was not created to be a criminal endeavor. Donald was not an

organized person, as Lancaster and Alcantara described                            .

.                                   Donald was no longer the woman who had

run a successful OB/GYN practice for many years when she started the pain

practice, or even who she was in the year or two before.  Felicia's psychological

issues show that she did not have the ability to plan and organize to be a leader

or organizer at the level ascribed by the PSR.  When, in the summer of 2018,

someone suggested she start a pain practice, she grabbed onto the idea and

did.  She did not have a structure for it.  Felicia only formed the LLC for Nova

Addiction in December 2018, after it was already in operation.

Other aspects of the pain practice show that she was woefully short

on planning.  Felicia had a poorly written pain contract, was not performing

sufficient oversight, did not maintain appropriate records, nor did she

routinely perform meaningful examinations.  She did not even maintain the

appearance of a well-run practice.  This could be expected given how she was

dipping in and out of the pain practice while overcommitting herself to other

things.  Felicia was maintaining Dr. Singh's practice while Dr. Singh was ill

with stage four cancer at Johns Hopkins in Baltimore.  Donald, from August

until December 2018, was maintaining Dr. Singh's practice for her, running

her own OB/GYN practice, and also trying to run her pain practice.  After Dr.

Singh returned in December 2018, Felicia undertook an OB/GYN locum while

- 8 -

also operating her own OB/GYN practice and the pain practice.  A locum required her to work twenty-four hour shifts, adding to her sleeplessness which impacts her cognitive functions.  She has to be on call 24/7 in her own OB/GYN practice.  Additionally, she is sleep deprived because she suffers from sleep apnea.                                      .  At the same time, she was caring for her elderly father and special needs brother.

### 6.    Scope of The Illegal Activity.

This case is fundamentally about a small group of people, who did have real pain, were taking opiates, and became addicted.  There were twenty-three or so patients overall in the pain practice.  Many of the prescriptions which are at issue in this case went back to Lancaster and Alcantara, who quite unfortunately, had been addicted and continued their addictions when they worked at Donald's pain practice.  Felicia wrote scripts improperly and far too freely.  She is guilty of, and remorseful for that conduct.  This is not a case with an elaborate street sale network, overdoses, deaths, or careful planning, well organized and controlled wide distribution.  This is fundamentally a poorly controlled pain practice with insufficient oversight and a lack of proper boundaries by a doctor with her own mental problems and impairments.

### 7.  Authority Over Others

As previously noted, there was a lack of supervision and failure to exercise responsible authority during much of the pain practice. Felicia was neglectful of her pain practice, and was not regularly there.  When direct control was finally exerted over Lancaster and Alcantara in June of 2019 and they were fired, it was actually a positive act.

In considering these factors, four levels for Felicia as the head of a large-scale hierarchical drug organization is not appropriate.  She is not a drug kingpin or cartel leader.  She did admit to a leadership role in the Statement of Facts.  That role ought to be, at most, a two level enhancement.  A four level enhancement is disproportional to the facts.

### B.    Leadership: Participants vs. Assistants

There were not five or more participants in the conspiracy, as defined by the Guidelines.  There is a legal difference between a participant, which has a carefully defined meaning, and what the Statement of Facts refers to as those who "assisted".  While it was agreed in the Statement of Facts that there were five or more who "assisted" in this conspiracy, because of the nature of those persons being "end users", they do not fit the definition of participants for purposes of this Guideline enhancement.

Application Note 1 to §3B1.1 defines a "participant" as "a person who is criminally responsible for the commission of the offense." USSG §3B1.1, comment. (n.1).  In the context of a drug conspiracy, courts have held that end users of controlled substances who obtain them from the conspiracy so they can use them are not "participants" in distribution conspiracies. To qualify as a participant, a customer must do more than simply purchase quantities of a drug for their own personal use. *See United States v. Egge*, 223 F.3d 1128, 1133-34 (9th Cir. 2000); *see also United States v. Barrie*, 267 F.3d 220, 224 (3d Cir. 2001).   ("Customers of drug dealers ordinarily cannot be counted as participants in a drug distribution conspiracy.")  The patients in this case were individuals who bought to use.  There are no cases of street sellers who were arrested and identified Donald as their source like in *United States v. Simon* (Docket No. 1:14-cr-300-001 (EDVA- Alexandria 2015)) or *United States v. Hurwitz,* 459 F.3d 463 (4th Cir. 2006).  This is not a case of buyers who purchase drugs for further distribution, and would thus be "participants" under §3B1.1.

While Lancaster  participated in distribution activities to others, and the "close associate" in the statement of facts is said to participate in further distributions, this is largely a case about end users receiving prescriptions that

should not have been written.[1]  This is not a case about a street sale network or a series of undercover purchases that are traced back to Donald.  While there are those who may have "assisted" in the process of receiving drugs for themselves, this conspiracy, on the whole, does not involve five or more "participants" as contemplated for a four level enhancement.

## C.    Purpose Behind the Leadership Guideline

The commentary that is part of 3B1.1 regarding its purpose is that the "Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility." Commentary that accompanies a guideline under 1B1.7.  is a policy statement. The policy behind 3B1.1(a) is to apply it to large organizations engaged in large scale dealing, not a small pain practice whose patients buy and use themselves. The four levels for Felicia is not appropriate in this case.  She is not a drug kingpin or cartel leader.  She is not the neighborhood supplier.  This is mainly a case about end users receiving prescriptions that should not have been written.

---

[1] A June 2020 search of that "close associate's" home and seizure of her electronic media, text messages, and emails, plus an investigation into her associates yielded not a single sale or distribution.  That post plea investigation did not establish any actual corroborative proof of any actual distributions.

A leadership enhancement may apply, but if it does, it is at a much lower level.  An example of a much more organized and structured case which only yielded a two level enhancement is found in *United States v. Kelly*, 36 F.2d 1118, 1129 (D.C. Cir. 1994).  That case applied the enhancement more in keeping with the Guideline's purpose and intent.  In *Kelly*, the defendant recruited four others for a bribery, kickback, cover-up scheme.  Two, "A" and "F", were instructed by Kelly to remove mention of a matter in a proposal, and complied.  They were instructed by Kelly to obtain black market checks and where to send them, and complied.  "D" and "C" were directed by Kelly to open bank accounts for the proceeds and did, as had the others, what they were told to do.  Kelly also threatened to withhold money from them if they did not do as they were told.  All of this resulted in a two – not a four – level enhancement.  Notably, this was a much more structured and hierarchal organization than we have in this case.

## <u>OBSTRUCTION OF JUSTICE</u>

3C1.1 requires that "[i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense,

- 13 -

increase the offense level by 2 levels."   Note 4 gives an example of covered conduct as "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." This is the basis on which the PSR bases the obstruction enhancement.  The facts of the May 11 email to Felicia's sister does not support this enhancement. Felicia's sister Juliana is not and was not a co-defendant.  Nor was she going to be a witness in a prosecution against Felicia.  She has counsel and has not been interviewed.  Felicia has pled guilty and accepted the statement of facts. There was nothing to testify about in her case when the 11 May email was sent.  All through this process, up to and after her guilty plea, Felicia, like she has done all her life, consulted with her sister about what to do and about her case.

Felicia and Juliana have talked daily throughout their lives.  Juliana was communicating with her sister about her lawyers, about their advice, and extensively about this case.  Juliana is and has been a major component of her support network all her life.  On this basis, and based on the Court's written order, there was no attempt to obstruct justice, or conduct that justifies enhancing the sentence.  Very close sisters talking to each other is not a crime.

In the context of obstruction of justice under 18 U.S.C. § 1512 (which provides some guidance given the dearth of information related to the

obstruction guideline) it must be shown that the intent to influence was corrupt. *See* 3C1.1 application note 4 (I) (referring to the obstruction statute in Guideline applications). In *United States v. Edlind*, 887 F.3d 166, 173 (4th Cir. 2018), where the obstruction of justice was based on corrupt persuasion of a witness to lie, the court noted that the government had to prove not only that the defendant used persuasion towards a third party, but also that the persuasion was corrupt, because "the word 'corruptly' is what serves to separate criminal and innocent acts of" influence. *Edlind* at 173, (citing *United States v. Edwards*, 869 F.3d 490, 498-99 (7th Cir. 2017). "[P]ersuasion," the Supreme Court has explained, is by itself "innocuous" and "not inherently malign." *Arthur Andersen, LLP v. United States*, 544 U.S. 696, 703-04 (2005). "Consider, for instance," the *Arthur Andersen* Court wrote, "a mother who suggests to her son that he invoke his right against compelled self incrimination, or a wife who persuades her husband not to disclose marital confidences." *Id*. at 704 (citations omitted). Felicia asking her sister about how the sister defend herself is not corruptly asking her sister to do anything unlawful. Felicia was asking Julianna how she would defend herself. That is the only interpretation that is reasonable, given the context of her question. Juliana was not and is not a co-defendant and was not going to be a witness in

Felicia's case.  The plea had already been entered.  The statement of facts was already agreed, and would not be disputed at sentencing.

Guideline 3C1.1. contains a clear *mens rea* requirement that limits its scope to those who "willfully" engage in conduct *calculated* to mislead or deceive authorities or those involved in a judicial proceeding, or to interfere with the disposition of charges in a criminal case.  See, *United States v. Stroud*, 893 F.2d 504, 507 (2d Cir. 1990).  The statement asking Juliana how could she "disprove" what Felicia said in the statement of facts about Juliana is not an invitation for Juliana to lie.  There was no invitation to do something illegal. Felicia wanted to know how Juliana might be able to defend herself against Felicia's admissions.  It was a question, not persuasion.  Felicia was concerned that she might have exposed her sister to danger in a potential prosecution of Juliana.  Felicia did not want to hurt her sister.  She had previously talked with her about the case and had already agreed to accept the plea agreement and its facts.  If Felicia disavowed the Statement of Facts and sought to break the Plea Agreement and go to trial, those circumstances could allow a different interpretation of the statement, but that is not this case.  Felicia was worried that she could hurt her sister with her admissions and agreement, and wanted her sister to look to defend herself.  To spin that question into an attempt at

- 16 -

unlawful interference in Felicia's case is taking a single question out of the context of their life-long relationship.

The presentence report also seeks an obstruction enhancement because Felicia was in frequent contact not only with her sister, but also with her dear friend, Tracy Taveres Thomas, who has a close friend for more than twenty years. Felicia did talk to them and text them about selling her practice, getting support letters, and selling her medical equipment. Tracy was another person who was a key part of Felicia's support network. Tracy was not named in the information or statement of facts as a co-conspirator. She was not then and is not now a co-defendant. She was not interviewed by federal agents. When they tried to interview her, she had a nervous breakdown and ended up in a mental ward for three days. There is nothing in this case to suggest that Felicia ever attempted to corruptly influence Tracy or have her obstruct justice. The repeated contact, with Tracy and Juliana, is not a basis for a lawful enhancement under 3C1.1. It was not an effort to obstruct this case. It was contact with the two people closest to her.

## 2D1.1 SPECIAL OFFENSE ENHANCEMENT

The defense objects to an enhancement under 2D1.1(b)(16)(B). The Guidelines require that "the defendant, knowing that an individual was … (iii) pregnant, … distributed a controlled substance to that individual or involved

- 17 -

that individual in the offense."   This enhancement appears to be a *per se* enhancement merely because there was a distribution of a controlled substance to a person who was pregnant.  The typical circumstances of a distribution that this enhancement covers (illegal narcotics such as cocaine, heroin, ect.) does not account for the context of a medical practice, which is why it appears to have a *per se* prohibition.   In the context of a medical practice, there are controlled substances that are permissible to be dispense to pregnant women. The attached letter, from Dr. Steven Gershon, MD, a pain medicine practitioner and specialist who has been practicing in that field since 1992, establishes that there are circumstances where pain medication may be prescribed to pregnant women.   This enhancement should only apply to wrongful conduct that harms someone.  In this context, it is not shown, by a preponderance of the evidence, that the conduct here was wrongful and harmful, and thus deserving of an enhancement.

## ACCEPTANCE OF RESPONSIBILITY

The defense objects to the presentence report seeking to deny Felicia acceptance of responsibility.  We agree with the government that she fits the criteria for acceptance.

Among the reasons the PSR offers to deny acceptance of responsibility, is the claim that Felicia did not provide *any* requested documents.  Since

current counsel has been in the case, the financial statement was provided, as well as two years of tax returns.  It was difficult to obtain even these given her incarceration since the middle of July and the difficulties that situation presents with client communication and access.

The Presentence Report argues that Felicia obstructed justice.  As previously shown, Felicia did not ask anyone to lie, did not keep anyone from providing information to the government, and did nothing improper to try to thwart an investigation.  Indeed, Felicia met with and was interviewed by the FBI on multiple occasions during the investigation.  She gave them her cell phone, electronics, and patient records when they asked for them.  She answered their questions.  She did all of this without consulting with an attorney.  She cooperated, and entered a pre-indictment plea to the charges in this case within five weeks of a target letter.

The repeated contacts between Juliana and Felicia are a product of how dependent they are on each other, as they have been throughout their lives.  The repeated contacts for help about the case, and later, more recent ones about selling the medical practice and office condo, were a result of not having anyone else to turn to from her family or friends.  Juliana is someone she fundamentally trusts. As a result, that is where she reached for help.  That is especially so for the later contacts.  She was trying to avoid a foreclosure and

- 19 -

distress sale of her office condominium, but, as with other business dealings, she went about achieving that in the wrong way. This is another example of the brain damage and mental defects that are part of the diagnosis of impulsive decision making, self-defeating and self-destructive behavior, and inability to think things through. Felicia is more self-destructive than she is criminal.

The Report also addresses the loans Felicia received as a reason to deny Acceptance. The loan was applied for in March, and accepted in May. Felicia electronically signed a DocuSign PPP loan acceptance after her plea. She was prompted by the DocuSign program where to sign and was taken by that program automatically to that point. She then let it go to the signature line without reading the certifications and other fine print. It was a mistake, but not a criminal or willful violation of the law. As the psychiatric reports establish, she has impairments when it comes to details, organization, and executive function. This further explains that her mistake was not willful. This mistake does not mean that Felicia has not accepted responsibility for what she did in this case. She has accepted that what she did in her practice was wrong; has surrendered her license, and give up a practice of 33 years. In a few short weeks, her entire life turned upside down. That is a major trauma for one of her age with her mental conditions.

The Presentence Report also bases the denial on the post plea sonogram to a long-time patient after her guilty plea. The Report claims that a sonogram has to be performed by a radiologist, under the supervision of a doctor. However, this is not true. A technician with no medical or radiologic degree can perform sonograms or ultrasounds. The cited section of the Code of Virginia deals with radiological medicine. It does not address ultrasounds or sonograms. Sonograms and ultrasounds do not use x-rays or other radiology. The Fourth Circuit, in *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 879 F.3d 101, 106, 109-10 (4th Cir. 2018) recognized that sonograms performed at a pro-life pregnancy center were not subject to state regulation as the practice of medicine in Maryland. Similarly, in Virginia, a sonogram or ultrasound does not require licensing. It is not radiology. As women who have had a sonogram know, it is not an x-ray. While it was a very poor choice to perform the sonogram, that one-time event does not establish that she does not accept responsibility for her actions in this case. She was asked and she thought she was helping. She meant no ill will and did no harm.

Finally, the presentence report states that the revocation of conditions of release is a basis for a denial of acceptance of responsibility. The violations that brought Felicia before the Court to revoke her release do not change the

- 21 -

fact that she has accepted the facts of what she did, accepted that she has committed a crime, knows she will go to prison, and pay a hefty amount to the government, has ended the career that was her life for over 30 years, and is remorseful for her wrongful conduct that she admitted.

FELICIA DONALD
By counsel

_____/S/_____
BRET D. LEE, ESQ.
VSB No. 82337
15021 Judicial Drive Suite 105
Fairfax, VA 22030
703 936 0580
bret@bretlee.com

_____/S/_____
MARVIN D. MILLER, ESQ.
VSB No. 1101
Law Office of Marvin D. Miller
1203 Duke Street
Alexandria, Virginia 22314
703 548-5000
Fax 703 739-0179
ofc@mdmillerlaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 24th day of November 2020, a true copy hereof was provided to Raj Parekh, Assistant United States Attorney, United States Attorney's Office, Eastern District of Virginia, 2100 Jamieson Avenue, Alexandria, VA 22314-5794.

_____/S/_____
MARVIN D. MILLER